*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CLOVERLEAF CAR COMPANY, doing business as CLOVERLEAF RV AND RV OUTFITTERS, JILL E JOHNSON, and JOHN M JOHNSON,

Plaintiffs-Appellants,

v

CASCADE UNDERWRITERS INC and JOHN LAWRENCE HIERONYMUS,

Defendants-Appellees.

UNPUBLISHED
June 16, 2022

No. 357435
Kalamazoo Circuit Court
LC No. 2020-000053-NZ

Before: RONAYNE KRAUSE, P.J., and M. J. KELLY and YATES, JJ.

PER CURIAM.

Plaintiffs appeal by right the trial court order granting defendants' motion for summary disposition under MCR 2.116(C)(10). Because the trial court did not err by granting summary disposition, we affirm.

## I. BASIC FACTS

Plaintiff, Cloverleaf Car Company, is a business that sells, repairs, and refurbishes recreational vehicles. Until May 2009, Cloverleaf was owned by plaintiff Jill Johnson's father. When Jill's father passed away, his wife became owner of the business. Approximately five months later, in October 2009, Jill became the sole owner of Cloverleaf.

As relevant to this case, Jill began looking for business insurance for Cloverleaf in January or February of 2010. She explained that, in May 2009, the business had been covered by a policy issued by Auto-Owners; however, because Cloverleaf made a claim for a substantial loss caused by a tornado/storm, Auto-Owners declined to renew that policy. Jill recounted that she called a few insurance agents to insure Cloverleaf, but after disclosing the substantial loss the business had just sustained, she was unsuccessful. Eventually, she remembered that her father had previously

obtained insurance policies for Cloverleaf through defendant Cascade Underwriters, Inc,[1] so she contacted Cascade's owner, John Hieronymus, and set up a meeting to discuss whether he could procure insurance for the business.

In early 2011, Jill and her husband, John Johnson, met with Hieronymus for at least one hour to discuss acquiring insurance for Cloverleaf. John recalled that Hieronymus asked him to take photographs of his tools, but otherwise had no recollection of what was discussed at the meeting. Jill, on the other hand, recalled some details. Relevant here, Jill stated that Hieronymus told them that they needed "all kinds of insurance" and that he promised that he was going to try to get them insured. As it relates to Commercial Property insurance, Jill testified that she discussed coverage for personal property inside the building she leased; she added that Hieronymus asked her husband to take photographs of his tools. Moreover, Jill indicated that Cloverleaf had leased the building, and she stated that she showed Hieronymus a copy of the lease. Although a copy of the lease has not been included in the lower court record, Jill testified that the lease indicated the insurance that she "had to have," and Hieronymus averred that the lease she showed him indicated that Cloverleaf "was responsible for obtaining contents insurance for its property at the premises it was leasing." Hieronymus stated in his affidavit that, based on the initial meeting with plaintiffs, he attempted to obtain Commercial Property insurance that would cover the contents of the buildings that Cloverleaf was leasing.

Hieronymus and Jill offer differing accounts of what followed. Jill testified Hieronymus returned to the business and gave her a binder with the insurance proposal. She did not remember any details of the proposal; however, she stated that he did not go through the proposal with them. Instead, she flipped through the proposal and then gave him a check for the premium. However, in support of their motion for summary disposition, defendants submitted a note from another insurance agent's file indicated that, as of February 14, 2011, Hieronymus got coverage for the "inventory" and the "garage keeps," but that he "needs to still get building covered." Hieronymus averred that he "specifically advised Mrs. Johnson that Cascade could not find a quote for any insurance for Cloverleaf RV in the standard market, that [he] could not find a quote for Commercial Property insurance in the surplus market and that the proposal did not include Commercial Property insurance for the contents of the buildings occupied by Cloverleaf." Although he did not have a copy of the proposal he gave to Cloverleaf in 2011, he had a copy of the proposal he gave for every year thereafter.[2]

---

[1] Cascade Underwriters Inc had insured Cloverleaf between 1997 and 2007. Thereafter, Cloverleaf switched insurance agents in order to secure a lower premium.

[2] According to Hieronymus, the proposals all indicated that a quote for "tools and equipment," "employee tools," and "miscellaneous property" would be available upon request. Likewise, under optional coverage, they stated that a quote for "business income coverage" was also available upon request. The proposals also included a warning that Cascade did "not profess or guarantee the adequacy of the amounts of insurance contained in this proposal," and advised that plaintiffs

-2-

The record reflects that plaintiffs considered a proposal from Sentry Insurance in 2014. Specifically, Jill faxed a copy of a February 27, 2014 business insurance protection plan proposal prepared by Jason Visser from Sentry Insurance. The facsimile transmittal sheet indicated that the fax was from Jill to Hieronymus (Fax). Jill made the following handwritten notation on the transmittal sheet: "John thinks this is better[.] Please let me know. Thanks Jill[.]" Unlike the proposal offered by defendants, the Sentry proposal included coverage for the contents of the building. Hieronymus averred that he spoke with Jill about the differences between the proposal defendants' had given her and the proposal submitted by Sentry. He stated that after the discussion, plaintiffs decided to renew their policy rather than accept the Sentry proposal. Jill testified at her deposition that she had never looked for other insurance or received any proposals from other insurance agents while she was defendants' client. When presented with the Sentry proposal, she testified that it did not look familiar "at all" and that she did not recall receiving the proposal from Sentry in 2014.[3]

On February 16, 2017, there was a fire at Cloverleaf. Plaintiffs filed a claim, but learned that they did not have insurance coverage for the contents of the building or any losses associated with business interruption or business relocation. Thereafter, on February 5, 2020, they filed a complaint against defendants, alleging that defendants had breached its fiduciary duty to plaintiffs, had made "errors and omissions," and had committed silent fraud. Following discovery, defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10). The trial court denied the (C)(8) motion because it found that defendants owed a fiduciary duty to plaintiffs. However, it granted summary disposition under MCR 2.116(C)(10) because plaintiffs had not shown there was a genuine question of material fact with regard to whether defendants had breached that duty. This appeal follows.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Plaintiffs argues that the trial court erred by granting defendants' motion for summary disposition under MCR 2.116(C)(10). We review de novo a trial court's decision on a motion for

---

should "carefully review the amounts of insurance, locations, limits, and notify us of any difference or changes."

[3] In contrast, the case notes from Sentry include several entries related to Cloverleaf. For example, the notes indicate that on December 15, 2010, John was interested in Sentry's "review of their current policies." Thereafter, the agent spoke with Jill and discussed her current coverage; significantly, the notes indicated that "Jill feels she has moral obligation to stick with the current agent *despite the suspected coverage deficiencies*." (Emphasis added). Nevertheless, Sentry provided a quote on January 27, 2014. And, as of March 5, 2014, John told Sentry that "they don't just drop people over dollars and cents," that their current provider "has done everything they expect of him," and that they would not change "just to save a little money."

summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering*, *Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009).

## B. ANALYSIS

"In a negligence action, a plaintiff must show that the defendant owed the plaintiff a duty, that the defendant breached that duty, causation, and damages." *Pressey Enterprises, Inc v Barnett–France Ins. Agency*, 271 Mich App 685, 687; 724 NW2d 503 (2006). Here, plaintiffs argue that because defendants were independent insurance agents, "their primary duty of loyalty rested with plaintiffs, who could depend on this duty of loyalty to ensure that defendants were acting in their best interests both in terms of finding an insurer that could provide them with the most comprehensive coverage and in ensuring that the insurance contract properly addressed their needs." *Genesee Foods Servs, Inc v Meadowbrook, Inc*, 279 Mich App 649, 656; 760 NW2d 259 (2008). They contend that defendants breached that duty because they did not "inform" plaintiffs that the policy they purchased did not provide casualty coverage for Cloverleaf's personal property on the premises. In essence, then, plaintiffs posit that defendants' breached their fiduciary duty to *advise* them as the adequacy of the coverage provided.

The lead case on an insurance agent's duty to advise an insured as to the adequacy of the coverage provided is *Harts v Farmers Ins Exch*, 461 Mich 1; 597 NW2d 47 (1999). In *Harts* the issue was whether a "licensed insurance agent owes an affirmative duty to advise or counsel an insured about the adequacy or availability of coverage." *Id*. at 2. The plaintiffs in *Harts* had obtained a Farmers Insurance policy through their insurance agent, who sold insurance exclusively for Farmers. *Id*. at 3. The policy did not include uninsured motorist coverage. *Id*. The plaintiffs contended that the agent was negligent in selling them a policy that was inadequate because it did not include uninsured motorist coverage. *Id*. Our Supreme Court, however, concluded that the insurance agent did not have a duty to advise the plaintiffs as to the adequacy of the coverage. *Id*. at 2-3.

The *Harts* Court held that because the insurance agent was Farmers' agent, "under the common law, he had a duty to comply with the various fiduciary obligations he owed to Farmers and to act for its benefit" but he did not have a "common-law duty to advise plaintiffs." *Id*. at 6–7. Additionally, the Court also noted the general rule that insurance agents have no duty to advise an insured regarding the adequacy of insurance coverage. *Id*. at 7. The *Harts* Court explained that a contrary rule, i.e., one requiring an insurance agent to advise the insured about the adequacy of the coverage,

> (1) would remove any burden from the insured to take care of his or her own financial needs and expectations in entering the marketplace and choosing from the competitive products available, (2) could result in liability for a failure to advise a client of every possible insurance option, or even an arguably better package of insurance offered by a competitor, and (3) could provide an insured with an opportunity to self-insure after the loss by merely asserting they would have bought the additional coverage had it been offered. [*Id*. at 7–8 (quotation marks and citation omitted.]

The court concluded that, as a result, "under the common law, an insurance agent whose principal is the insurance company owes no duty to advise a potential insured about any coverage. Such an agent's job is to merely present the product of his principal and take such orders as can be secured from those who want to purchase the coverage offered." *Id*. at 8

The Court also noted that, "[o]ur Legislature also recognizes the limited nature of the agent's role." *Id*. Specifically, under Michigan's insurance statutes, there is a difference between insurance agents and insurance counselors, "with agents being essentially order takers" and insurance counselors functioning as advisors. *Id*. at 8–9. The Court determined "an insurance agent may, but is not required or under any duty to, give 'customary advice.'" *Id*. at 9 n 10, citing MCL 500.2116 and MCL 500.1232.

The *Harts* Court recognized that there is an exception to the no-duty-to-advise rule under certain circumstances. *Harts*, 461 Mich at 9-10. Thus, a duty to advise may arise if "an event occurs that alters the nature of the relationship between the agent and the insured." *Id*. at 10, citing *Bruner v League Ge. Ins C*o, 164 Mich App 28; 416 NW2d 318 (1987) (quotation marks omitted). The Court described four situations that give rise to a special relationship and a duty to advise on the part of the agent:

> (1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured. [*Id*. at 10–11.]

On appeal, plaintiff argue that defendants' duty of loyalty is stated in *Genesee Foods* and that *Harts* only applies to captive insurance agents, not to independent insurance agents. Yet, in several unpublished opinions, this Court has rejected similar arguments. See *Janovski v S J Ferrari Ins Agency, Inc*, unpublished per curiam opinion of the Court of Appeals, issued May 24, 2016 (Docket No. 326457) (collecting cases). In *Janovski*, this Court reasoned:

> Although *Harts* was clearly focused on insurance agents whose principal was the insurer, it spoke generally about whether there is any duty owed by insurance agents as to the limited issue of advising about the adequacy or availability of coverage. We concur with the reasoning employed in the above cited cases in concluding that the duty to advise rule from *Harts*, regarding the adequacy or availability of coverage, also applies to an independent agent. While the defendant in *Harts* was a captive rather than an independent insurance agent, *Harts* did not differentiate when framing the issue and rendering its ruling:
>
>> We granted leave in this case to determine whether a licensed insurance agent owes an affirmative duty to advise or counsel an insured about the adequacy or availability of coverage. We hold that, except under very limited circumstances not present in this case, an insurance agent owes no such duty to the insured. [*Harts*, 461 Mich at 2].

The Court also made the following public policy argument:

> plaintiffs encourage this Court to eliminate the general no-duty-to-advise rule and replace it with a rule that would impose a duty to advise in cases such as the one at bar, which, to be perfectly clear, would apparently be all cases concerning the purchase of insurance. However, we decline this invitation in light of the public policy established by the Legislature's active role in this area and the previously noted compelling reasons that militate against the imposition of such a duty. Rather, we agree with the Wisconsin Supreme Court, . . . which, when faced with such an issue, stated that "if such a duty is to be imposed on the [insurance agent], it should be imposed as a statutory one and not an implied judicial one. [*Harts*, 461 Mich at 11–12.]

> Further, the Court discussed MCL 500.2116 and how it treats captive agents the same as independent agents with regard to order-taking functions, as well as MCL 500.1232, which restricts those who can give advice about insurance policies to licensed insurance counselors, aside from "the customary advice offered by a licensed insurance agent." See also *Harts*, 461 Mich at 8–9. Hence, the Court in *Harts* concluded, a licensed insurance agent may give "customary advice," but is not under any duty to do so. *Id*. at 9 n 10. Additionally, we note [that] nothing in the Court's opinion in *Harts* specifically indicated that the Court only intended to address captive agents, rather than independent agents, with regard to the duty at issue. And, although plaintiffs cite cases such as *Genesee Foods Servs*, for the idea that independent agents owe a fiduciary duty to the insured, those cases do not expressly mention a duty to advise the insured about the adequacy of coverage. Accordingly, we conclude that *Harts* applies to the issue before us.

We find the *Janovski* Court's reasoning to be persuasive and, likewise, conclude that *Harts* applies to the issue before us. See *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010) ( noting that although unpublished opinions are not binding, this Court may consider them as persuasive authority).

Here, plaintiffs argue that a special relationship exists between them and defendants because (1) Cloverleaf had a long history with defendants, (2) Hieronymus is credentialed as a CPCU, i.e., a Chartered Property Casualty Underwriter, which means he specializes in property-casualty insurance and risk management, (3) defendants "had complete knowledge" of plaintiffs business and insurance needs, and (4) defendants indicated that they would help obtain all the coverage that plaintiffs needed. Yet, although there is record evidence that Cloverleaf has a long history with defendants and that Hieronymus is a CPCU, the record does not support a finding that defendants had "complete knowledge" of the insurance plaintiffs needed. Rather, Hieronymus provided evidence as to what insurance was required by law and what insurance plaintiffs sought because their lease indicated that it was their responsibility, but that does not equate to a finding that defendants therefore had "complete knowledge" of plaintiffs' insurance needs. Nor does the record allow for an inference that defendants promised to provide all coverage needed. Instead, it appears that defendants agreed to try and procure specific coverage, but were unable to find an insurer that would cover the contents of the buildings.

Moreover, plaintiffs do not direct this Court to any record evidence indicating that defendants misrepresented the nature or extent of the coverage offered. Indeed, plaintiffs were provided with proposals that indicated that a quote was available upon request for coverage of tools, equipment, miscellaneous property, and business income. Further, the uncontradicted record indicates that they were mailed a copy of their insurance policies each year. Although neither Jill nor John fully read the policies, Jill stated that, based on her reading of the language in the policy, she believed that the contents of the buildings was covered (Jill Dep, pp 63, 75-76, 92; John Dep, 24). She has not directed this Court to any affirmative act by defendants that led her to reach that conclusion. Therefore, viewing this record in the light most favorable to plaintiffs, there are no facts indicating that defendants misrepresented to plaintiffs the nature or extent of the coverage.

Nor is there evidence that an ambiguous request was made that required a clarification. Indeed, although plaintiffs desired "full coverage" for their property and although Hieronymus attempted—and failed—to procure coverage for the contents of the buildings, neither Jill nor John recall asking Hieronymus any questions regarding the adequacy of the coverage. For the same reasons, the third scenario under which a special relationship may arise is also not present. Plaintiffs did not request advice as to the adequacy of their coverage, and they have directed this Court to no evidence indicating that defendants provided them with inaccurate advice. Finally, the record is devoid of any evidence indicating that defendants assumed a duty to advise plaintiffs regarding the adequacy of the coverage.

Because there is no special relationship between defendants and plaintiffs, we conclude that defendants did not have a duty to advise plaintiffs as to the adequacy of their coverage. Summary disposition, therefore, was warranted.

Moreover, assuming *arguendo* that defendants did have a duty to advise plaintiffs that the policy procured did not provide coverage for the contents of the building (or for business interruption/relocation), we conclude that the trial court did not err by determining that the duty was not breached. Defendants presented documentary evidence showing: (1) they attempted to procure a policy that would cover the contents of the buildings, (2) they were unable to do so because of Cloverleaf's prior loss history, (3) they submitted a written proposal to plaintiffs annually between 2011 and 2016, (4) Hieronymus discussed the proposal with plaintiffs each year, (5) Hieronymus never told plaintiffs that they had coverage for the contents of the buildings they leased, (6) plaintiffs received a copy of their insurance policy in the mail each year, (7) plaintiffs did not read the policies, (8) plaintiffs relied on another insurance agent to secure a surety bond for Cloverleaf, (9) plaintiffs received a proposal for business insurance from Sentry Insurance in 2014, (10) the Sentry proposal included coverage for contents, (11) Hieronymus discussed differences between the two 2014 proposals with Jill, (12) Jill chose to renew her existing policy rather than switch to the Sentry proposal, and (13) a note from Jill to another insurance agent indicated that she as aware, in 2011, that the contents of the buildings were not covered.

The evidence relating to the 2011 proposal and discussion of the coverage offered was contradicted. Specifically, Jill testified at her deposition that Hieronymus dropped off a binder, she flipped through it, and then gave him a check. Contrary to his testimony, she stated that he did not discuss the matter with her. Moreover, as noted by plaintiffs on appeal, the 2011 note from Jill indicating that she was aware that Hieronymus had not obtained coverage for the contents of the building was dated prior to when the policy was issued. Thus, viewing that document in the

-7-

light most favorable to plaintiffs, it does not support an inference that, at the time she accepted the 2011 policy, she was aware that it lacked coverage for the contents of the building.

Yet, at her deposition, she denied receiving insurance proposals from any other insurance agents while she was a client of defendants. When confronted with a facsimile transmittal sheet indicating that John believed a policy from Sentry was better and asking for advice, she admitted to having no memory of the Sentry policy.[4] Hieronymus, in contrast, remembered the details of the Sentry policy, and he averred that he discussed the differences between the policies with her. Again, the Sentry policy, unlike the Pro-Century policy that defendants had presented for renewal, included coverage for the contents of the buildings. In light of defendants uncontradicted evidence as to the discussion on the 2014 competing proposals, the record does not support plaintiffs' claim that there is a question of fact as to whether defendants ever discussed the nature and extent of the insurance coverage they were proposing. Further, the Sentry Insurance case notes indicate that the Sentry agent spoke with Jill, who opted to stay loyal to Hieronymus despite concerns regarding the adequacy of the coverage. Therefore, on this record, given that there is no evidence suggesting that, as of 2016, plaintiffs were unaware that they did not have coverage for the contents of the buildings that they were leasing. Moreover, there is no evidence supporting an inference that plaintiffs wanted coverage for business interruption or relocation. On this record, plaintiffs cannot show that there was a genuine issue of material fact as to whether defendants' breached their alleged duty to advise as to the adequacy of the coverage provided.

---

[4] In response to the motion for summary disposition, Jill submitted an affidavit stating that Hieronymus "did not advise that he would not attempt to provide any of the insurance we needed," and that he instead "indicated we would be fully covered." She added that she did provide him with any indication as to the amount of coverage she needed for the contents, but instead left it up to him to secure adequate coverage. She also stated that Hieronymus never told her that any proposal or insurance that he provided "year after year did not include insurance for our building contents," and that, if he had told her that, it would have been "a deal breaker because of the terms of our lease." She averred that he also never told her that the coverage provided did not include insurance for business interruption or relocation expenses." Her affidavit, however, contradicts her deposition testimony. At her deposition, the only conversation that she recounted details from was the initial meeting and Hieronymus's failure to advise her that there was no contents coverage in the 2011 proposal. She did not testify as to what he did or did not advise her in the subsequent years, and she provided no testimony that she ever requested business interruption or business relocation insurance. She also contradicted her deposition testimony that she had no recollection of the Sentry insurance proposal; she averred in her affidavit that he "did not state anything about us not having contents coverage that that time." Plaintiffs cannot create a genuine issue of material fact by submitting an affidavit that contradicts the affiant's prior deposition testimony. See *Kaufman & Payton, PC v Nikkila*, 200 Mich App 250, 256-257; 503 NW2d 728 (1993).

III.  MOTION TO AMEND PLEADINGS

Plaintiffs argue that the trial court err by not providing them with an opportunity to amend their pleadings.  However, they made no such motion.  We discern no error in the trial court's failure to sua sponte provide plaintiffs with an unrequested opportunity to amend their complaint.

Affirmed.  Defendants may tax costs as the prevailing parties.  MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Michael J. Kelly
/s/ Christopher P. Yates